UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

FRIENDS OF THE CLEARWATER,
ALLIANCE FOR THE WILD
ROCKIES, and the SIERRA CLUB, non-
profit corporations,

Plaintiffs,

v.

UNITED STATES FOREST SERVICE,
an agency of the U.S. Department of
Agriculture, and RICK BRAZELL, in his
capacity as Forest Supervisor for the
Clearwater National Forest,

Defendants.

Case No. 3:13-CV-00515-EJL

**MEMORANDUM DECISION AND
ORDER**

Pending before the Court in the above-entitled matter are the Cross-Motions for
Summary Judgment filed by the parties in this environmental case. The matters have been
fully briefed and are ripe for the Court's consideration. Having fully reviewed the record,
the Court finds that the facts and legal arguments are adequately presented in the briefs
and record. Accordingly, in the interest of avoiding further delay, and because the Court
conclusively finds that the decisional process would not be significantly aided by oral
argument, the Motions shall be decided on the record before this Court without a hearing.

## FACTUAL AND PROCEDURAL BACKGROUND

Plaintiffs, Friends of the Clearwater, Alliance for the Wild Rockies, and the Sierra Club, have brought this action against the Defendants, the United States Forest Service ("Forest Service") and Rick Brazell, in his capacity as Forest Supervisor for the Clearwater National Forest. Plaintiffs challenge the Forest Service's decisions approving the November 11, 2011 Clearwater National Forest Public Wheeled Motorized Travel Management Record of Decision ("ROD"), the August 2011 Final Environmental Impact Statement ("FEIS"), and the April 12, 2012 denial of Plaintiffs' administrative appeal. (Dkt. 1.) These decisions relate to the Forest Service's proposed implementation of the Clearwater National Forest Travel Plan ("Travel Plan") in the form of the chosen action alternative in the ROD, Alternative C Modified, which designates motorized roads and trails in the Clearwater National Forest ("CNF").

Plaintiffs' claims are brought under the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.*, alleging the Defendants' violated the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.*; National Forest Management Act ("NFMA"), 16 U.S.C. § 1600 *et seq.*; Executive Order 11644, as amended by Executive Order 11989; and the implementing regulations of these statutes and executive orders. (Dkt. 1.) Defendants counter that their decisions and actions were in accord and fully complied with the applicable standards and requirements of these statutes. (Dkt. 13.) Both parties

have filed Motions for Summary Judgment which the Court has taken up in this Order and finds as follows. (Dkt. 27, 32.)[1]

## DISCUSSION

1.    **Standing**

Defendants challenge the Plaintiffs' standing to bring their claims arguing they have failed to demonstrate an imminent and concrete injury resulting from the approval of the Travel Plan. (Dkt. 32 at 10.) In particular, Defendants assert that the Plaintiffs' declarations fail to provide specific facts showing their members have concrete plans to return to the affected areas of the CNF in the future. Plaintiffs counter that they have adequately demonstrated standing in their members' declarations by showing their long-term relationships with specific areas adversely affected by the Travel Plan and their firm stated intentions to return to those places in the future. (Dkt. 38.) To bolster their position, Plaintiffs have submitted two supplemental declarations which include specific averments of the declarants' definite plans and intentions to visit particular areas affected by the Travel Plan. (Dkt. 38-1, 38-2.)[2]

---

[1] The Complaint raises eight claims for relief. (Dkt. 1.) Plaintiffs have acknowledged that they are not pursuing claims six, seven, and eight. (Dkt. 38 at n. 1.) Accordingly, those three claims are dismissed.

[2] Defendants oppose the Court's consideration of these supplemental declarations arguing the Plaintiffs "should have [established their standing] in their opening briefing." (Dkt. 39 at 2.) While ideally standing is establish at the outset, given the procedural posture of the case and the fact that the Defendants had an opportunity to respond and address the supplemental filings, the Court finds it appropriate to consider the supplemental declarations for the purpose of establishing standing.

Article III of the United States Constitution restricts judicial power to deciding actual cases and controversies. *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009). Thus, the doctrine of standing "requires federal courts to satisfy themselves that the plaintiff has alleged such a personal stake in the outcome of the controversy as to warrant his invocation of federal-court jurisdiction." *Id.* (citations and quotations omitted). Plaintiffs bear the burden of establish standing by showing they are:

> under threat of suffering "injury in fact" that is concrete and particularized; the threat must be actual and imminent, not conjectural or hypothetical; it must be fairly traceable to the challenged action of the defendant; and it must be likely that a favorable judicial decision will prevent or redress the injury.

*Jayne v. Sherman*, 706 F.3d 994, 999 (9th Cir. 2013); *see also Summers*, 555 U.S. at 493.

Organizations may establish "the concrete and particularized injury" by pointing "to their members' recreational interests in the National Forests. While generalized harm to the forest or the environment will not alone support standing, if that harm in fact affects the recreational or even the mere esthetic interests of the plaintiff, that will suffice." *Summers*, 555 U.S. at 493 (citing *Sierra Club v. Morton*, 405 U.S. 727, 734–736 (1972)). The Ninth Circuit has recognized that such an injury can be found in the testimony of a member of an environmental group that he or she "had repeatedly visited an area affected by a project, that he had concrete plans to do so again, and that his recreational or aesthetic interests would be harmed if the project went forward without his having the opportunity to appeal." *Wilderness Society, Inc. v. Rey*, 622 F .3d 1251, 1256 (9th Cir. 2010). Further, "[w]here the recreational use of a particular area has been extensive and in close proximity to the plaintiff, an affiant's expressed intention to

continue using the land is sufficiently concrete to underwrite an injury-in-fact." *Jayne*, 706 F.3d at 999 (citation and internal quotation marks omitted). However, a "vague desire to return to the area 'without any description of concrete plans, or indeed any specification of when the some day will be' does not support a finding of actual or imminent injury." *Id.*

The Court finds the declarations provided in this case are sufficient to establish standing. These declarations evidence the members' repeated visits to particular areas within the affected area over a long period of time as well as their firm intention to return to these areas in the future. (Dkt. 29-1, 29-2, 29-3, 29-4) (Dkt. 38-1, 38-2.) Such statements show that Plaintiffs will suffer an imminent, concrete injury from approval of the Travel Plan. Accordingly, the Court concludes that the Plaintiffs have established standing in this case.

## 2.    The Clearwater National Forest Plan

The CNF lies in north-central Idaho and comprises 1,827,380 total acres of forest lands offering a mix of diverse outdoor opportunities to its visitors including camping, hunting, hiking, skiing, biking, off-road vehicular travel, fishing, whitewater boating, and bird/nature viewing. Approximately half of the CNF, 950,311 acres, are designated as inventoried roadless areas ("IRA"). (AR3343.) 198,200 acres of the IRAs have been deemed recommended wilderness areas ("RWA"); meaning they are considered candidates for prospective Wilderness designation. (AR3342.) The CNF is also home to many species of animals and fish as well as their habitats.

In 1987, the Forest Service approved the CNF Land and Resource Management Plan ("Forest Plan") which set forth goals and objectives for multiple resource management in the CNF as well as standards and guidelines for specific activities and projects. (AR42365, 42885.) In 2005, the Forest Service published the Travel Management Rule, 36 C.F.R. §§ 212.1-261.55, which mandates certain changes to the management of motor vehicle use on National Forest System lands. Prior to the Travel Management Rule, motor vehicle use on public lands was largely unregulated resulting in uncontrolled cross-country motor vehicle use, unplanned routes, and damage to the resources. The Travel Management Rule was instituted to eliminate cross-country motor vehicle use by requiring designation of routes and areas for motor vehicle use. *See* 36 C.F.R. §§ 212.50(b), 212.55. The designated routes are displayed on a Motor Vehicle Use Map ("MVUM") which is annually updated and provided to the public. Any motor vehicle use inconsistent with the MVUM is prohibited. *See* 36 C.F.R. § 261.13.

In response to the 2005 Travel Management Rule, the Forest Service compiled the November 2011 ROD and August 2011 FEIS, as well as the related materials in the Administrative Record, for the CNF that are at issue in this case. These documents identify the alternative selected by the Forest Supervisor for the CNF as Alternative C Modified which establishes the Travel Plan with a system of designated routes for summer motorized uses, which Defendants argue, provides the best mix of motorized and

non-motorized opportunities in the CNF and proposes an amendment to the Forest Plan. (AR3308, 3321.)[3]

### 3.    NEPA Claims

The Complaint raises two claims alleging the Defendants violated NEPA. (Dkt. 1.) Because NEPA does not contain a separate provision for judicial review, we review an agency's compliance with NEPA under the APA, 5 U.S.C. § 706(2)(A). *Ka Makani O Kohala Ohana Inc. v. Water Supply*, 295 F.3d 955, 958 (9th Cir. 2002) (citing *Churchill Cnty. v. Norton*, 276 F.3d 1060, 1071 (9th Cir. 2001)). Claims alleging a violation of NEPA are governed by two standards of review. *See Price Rd. Neighborhood Ass'n, Inc. v. United States Dept. of Transp.*, 113 F.3d 1505, 1508 (9th Cir. 1997). Factual or technical disputes, which implicate substantial agency expertise, are reviewed under the "arbitrary and capricious" standard. *Id.* (citing *Marsh v. Oregon Natural Res. Council*, 490 U.S. 360, 376-77 (1989)). That is to say, when an agency reaches a decision based on its expert review of the facts, a reviewing court should determine only whether the decision was "arbitrary or capricious." *Id.* Legal disputes, however, are reviewed under the less deferential "reasonableness" standard. *Id.* (citation omitted).[4] The issues

---

[3] The Forest Plan amendment proposed in Alterative C Modified, and common to all action alternatives, would modify the periods of restriction for on-road use described in Appendix F of the 1987 Forest Plan. (AR3328, 3347, 3358-59.)

[4] The "reasonableness" standard of review, applies only to those "rare" cases in which the agency's decision raises legal, not factual, questions. *Kettle Range Conservation Grp. v. United States Forest Serv.*, 148 F.Supp.2d 1107, 1116 (E.D. Wash. 2011) (citing *Alaska Wilderness*, 67 F.3d at 727). Both standards may be applied in the same case to different issues. These standards reflect the axiomatic distinction between "the strong level of deference we accord an agency in deciding factual or technical

presented in this case involve factual and/or technical matters and, therefore, the arbitrary and capricious standard applies to all issues.

In reviewing an agency action under this standard, the Court must determine whether the action is "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A). A decision is arbitrary and capricious:

> only if the agency relied on factors Congress did not intend it to consider, entirely failed to consider an important aspect of the problem, or offered an explanation that runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Wildland CPR, Inc. v. United States Forest Serv.*, 872 F.Supp.2d 1064, 1074-75 (D. Mont. 2012 (quoting *Gardner v. United States BLM*, 638 F.3d 1217, 1224 (9th Cir. 2011) (quoting *Lands Council v. McNair*, 537 F.3d 981, 987 (9th Cir. 2008)).

Review under the arbitrary and capricious standard "is narrow, and [we do] not substitute [our] judgment for that of the agency." *McNair*, 537 F.3d at 987 (citations omitted); *Wildland CPR*, 872 F.Supp.2d at 1074-75. Nevertheless, the agency must examine the relevant data and articulate a satisfactory explanation for its action including a "rational connection between the facts found and the choice made." *Wildland CPR*, 872 F.Supp.2d at 1075 (citing *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)). In reviewing that explanation, the court must "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error

---

matters [and] that to be accorded in disputes involving predominantly legal questions." *Id.*

of judgment." *Id.* (citation omitted); *see also Marsh*, 490 U.S. at 378 (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971)).

In general, courts must grant substantial deference to the decisions and actions of federal agency defendants in adopting and implementing the certain agency activities. *Kettle Range Conservation Grp. v. United States Forest Serv.*, 148 F.Supp.2d 1107 (E.D. Wash. 2001). NEPA "does not mandate particular results, but simply describes the necessary process" that an agency must follow in issuing an EIS. *Id.* (citing *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989)). NEPA serves two fundamental purposes: (1) to require agency consideration of detailed information concerning significant environmental impacts; and (2) to ensure that the public can both access and contribute to that body of information via comments. *San Luis Obispo Mothers for Peace v. Nuclear Regulatory Comm'n*, 449 F.3d 1016, 1034 (9th Cir. 2006) (citation omitted). NEPA is strictly a procedural statute designed to ensure that federal agencies will take a "hard look" at the environmental consequences of any proposed agency action. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 23 (2008). Taking a "hard look" at environmental consequences of major federal actions includes "considering all foreseeable direct and indirect impacts" as well as involve "a discussion of adverse impacts that does not improperly minimize negative side effects." *N. Alaska Envtl. Ctr. v. Kempthorne*, 457 F.3d 969, 975 (9th Cir. 2006) (internal quotation marks and citations omitted); *see also Or. Natural Res. Council Fund v. Brong*, 492 F.3d 1120, 1133 (9th Cir. 2007) ("[G]eneral statements about possible effects and some risk do not

constitute a hard look absent a justification regarding why more definitive information could not be provided.") (internal quotation marks omitted).

Judicial review of administrative agency decisions under the APA is based on the administrative record compiled by the agency—not on independent fact-finding by the district court. *Camp v. Pitts*, 411 U.S. 138, 142 (1973). Courts may resolve APA challenges via summary judgment. *See Nw. Motorcycle Ass'n v. United States Dep't Agric.*, 18 F.3d 1468, 1472 (9th Cir. 1994). Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See* Fed. R. Civ. P. 56(a).

Here, Plaintiffs argue the Defendants violated NEPA because 1) the Travel Plan lacks a site-specific analysis and 2) the Defendants failed to consider a reasonable range of alternatives. (Dkt. 1.) The Court will apply the above standard to each of Plaintiffs allegations below.

## A.    Site-Specific Analysis

Plaintiffs argue the Defendants violated both NEPA and the Travel Management Regulations by failing to conduct a site-specific analysis, particularly as to the designation of a road, trail, or area for off-road vehicle ("ORV") use. (Dkt. 29 at 21-26.) The lack of such analysis, Plaintiffs argues, results in there being no proper consideration of the project's impact on Elk Habitat Effectiveness ("EHE") and sensitive aquatic species as well as no analysis of the affect of dispersed camping on riparian acreage and other direct, indirect, or cumulative impacts on other environmental concerns. (Dkt. 29 at 24-25.)

Defendants counter that they conducted the requisite site-specific analysis given the Travel Plan's scope which addresses public motorized uses within the entire CNF. (Dkt. 32 at 27-28.) This analysis, Defendants assert, satisfies NEPA's requirement that they take a "hard look" at the potential impacts of the project.[5] Plaintiffs maintain the FEIS's discussion relied upon by Defendants is not a "detailed analysis" of specific routes, particularly in sensitive areas such as stream crossings and fords, but only generalized narrative summaries. (Dkt. 38 at 16.) Plaintiffs argue the Defendants' are improperly substituting future monitoring to satisfy the analysis required by NEPA and dispute the Defendants' arguments concerning the scope of the area involved. (Dkt. 38 at 18.)

"NEPA requires that the evaluation of a project's environmental consequences take place at an early stage in the project's planning process." *Jayne*, 706 F.3d at 1007-08 (citing *Friends of Yosemite Valley v. Norton*, 348 F.3d 789 (9th Cir. 2003)). "That requirement, however, is tempered by (1) the statutory command that [a reviewing court] focus upon a proposal's parameters as the agency defines them, and (2) the preference to defer detailed analysis until a concrete development proposal crystallizes the dimensions of a project's probable environmental consequences." *Id.* (quotations and citations omitted). "To accommodate these concerns, NEPA requires a full evaluation of site-specific impacts only when a critical decision has been made to act on site

---

[5] Defendants note that the requirements under NEPA to take a "hard look" at a project's impacts is a distinct analysis to that of the Travel Management Rule's minimizing criteria requirement. (Dkt. 32 at 27 n. 11.) The Court will address the minimizing criteria later in this Order.

development, i.e., when the agency proposes to make an irreversible and irretrievable commitment of the availability of resources to a project at a particular site." *Id.* A site-specific EIS must include "data-gathering and analysis of system-wide impacts." *See Friends of Yosemite Valley*, 348 F.3d at 801 (finding data-gathering and analysis of system-wide impacts not required at the programmatic EIS stage); *California v. Block*, 690 F.2d 753, 761 (9th Cir. 1982) (explaining that considerations regarding the adequacy of a programmatic EIS may differ from those for a site-specific EIS).

"The detail that NEPA requires in an EIS depends on the nature and scope of the proposed action." *Block*, 690 F.2d at 761 (citation omitted). Other factors may include "the features of the land[ ] and the types of species in the area." *Selkirk Conservation Alliance v. Forsgren*, 336 F.3d 944, 958 (9th Cir. 2003). NEPA requires an agency to explain in the EIS how it chose the scope of the geographic area in which it conducted cumulative impact analysis and it must demonstrate that in making that choice it considered the relevant factors. *Native Ecosystems Council v. Dombeck*, 304 F.3d 886, 902 (9th Cir. 2002); *see Wetlands Action Network v. U.S. Army Corps of Engrs.*, 222 F.3d 1105, 1114 (9th Cir. 2000). The magnitude of the potential task does not excuse an absence of reasonably thorough site-specific analysis. *Block*, 690 F.2d at 765 (decision concerned 62 million acres of National Forest Service Land and a national, rather than a forest-specific, planning document).

The case relied upon by Plaintiffs, *Montana Wilderness Ass'n v. McAllister*, concluded that under the particular circumstances in that case, the Forest Service's lack of details, data, and discussion in the FEIS concerning the impact of the increased motorized

vehicle use in the area relating to intensity of use was arbitrary and capricious. *Montana Wilderness*, 658 F.Supp.2d 1249, 1255-56 (D. Mont. 2009). In *Montana Wilderness*, the court concluded that the Forest Service acted arbitrarily and capriciously because it had entirely failed to consider an important aspect of the problem regarding how area and concentration of use are related to intensity of use and effects to wilderness character amounts. *Id.* at 1255-56.

Defendants, on the other hand, point to *Wildland CPR, Inc. v. United States Forest Service* to support their position that they took the requisite "hard look" at the impact of the Travel Plan on the area and conducted the necessary site-specific evaluations given the scope of the project. (Dkt. 32 at 27-28) (citing 872 F.Supp.2d 1064, 1077-78 (D. Mont. 2012)). In that case, the court concluded that the Forest Service's landscape-level analysis, rather than a site-specific one, satisfied NEPA because the record demonstrated that the Forest Service had "examined relevant data and articulated a satisfactory explanation for its subsequent decisions." *Id.* There the Forest Service was considering the environmental consequences/impacts of motorized vehicle use in an area comprised of over three million acres. *Wildland CPR*, 872 F.Supp.2d at 1077-78.

Having reviewed the record in this case, in particular the ROD and FEIS, the Court finds the Defendants satisfied NEPA's "hard look" requirement in regard to their consideration and discussion of the impact the Travel Plan may have upon the particular environmental factors identified by Plaintiffs. The record shows that the Forest Service examined the relevant data and considered the environmental impacts of the proposed action upon the area given the scope of the action, which comprises the overall impact of

the Travel Plan on the CNF as a whole. The scope of the Forest Service's analysis is appropriately forest-wide. The purpose of the Travel Plan is to manage motorized travel within the entire CNF. Thus, the project must address the impact of motorized travel in the CNF's 1,827,380 acres. The Court finds the Forest Service's definition of the scope of the project is reasonable and satisfies NEPA.

Moreover, the Court finds in this case that the effects of the Travel Plan on the particular concerns raised by Plaintiffs are appropriately addressed in the Record. For instance, the impacts of the alternatives on watershed and fisheries conditions in the CNF are detailed in the FEIS using aquatic indicators. (AR2762-72.) The FEIS determined the cumulative impact/effect to be "minimal" on aquatic resources and streams based in part on twenty-six field reviews/evaluations being done on fourteen fish-bearing streams and twelve potentially fish-bearing streams. (AR2773-81.) Potential impacts at the route level are also included in the record. (AR23765-78, 21854-73, 2941-3195.) Additionally, the FEIS' analysis was not made in a vacuum given it relied and was built upon several years of prior NEPA studies. (AR3315-16.) The Court finds the Forest Service is not required to perform a more detailed site or route specific analysis in this case.

Plaintiffs further argue that the FEIS failed to analyze or consider the environmental impacts of the designation of roads and trails for motorized use particularly as to dispersed camping. The ROD contains a brief section on "Access for Dispersed Camping and Parking" noting it "may well be the most popular recreational activity in the [CNF]." (AR3347-48.) The ROD concludes that allowing this use to

continue, while minimizing its potential adverse effects on other resources, is consistent with the Travel Management Rule.

The FEIS discusses further the conditions under which this use will be permitted. (AR2573-74, 2576, 2579-81.) The FEIS recognizes that some site specific resource damage may occur as a result of dispersed camping. (AR2606, 2608, 2717, 2822, 2850.) For instance, the FEIS discusses the impact from cross-country travel and dispersed camping on streams including the North Fork Clearwater, Kelly Creek, Orogrande Creek, and Elk Creek. (AR2738.) The FEIS identifies the conditions for dispersed campsites that would be used under the chosen alternative and states that this use would be monitored and remediated in riparian areas along streams where impacts are found. (AR2763, 2780.) Having reviewed the record, the Court finds the Defendants satisfied NEPA's demand to take a "hard look" at the impact of dispersed camping. The record shows that the Forest Service considered the relevant data and provided a reasonable explanation for its conclusions such that it is clear it considered the environmental factors related to this particular use.

The Defendants' Motion for Summary Judgment is granted on this issue.

**B.      Reasonable Range of Alternatives**

Plaintiffs next argue the Forest Service violated NEPA's requirement that it consider a reasonable range of alternatives that would have protected the environment and minimized the harm of the proposed Travel Plan. (Dkt. 29 at 26-29.) Defendants counter that they satisfied NEPA's requirements in this regard. (Dkt. 32, 39.)

In preparing an EIS, an agency is required to "[r]igorously explore and objectively evaluate all reasonable alternatives," see 40 C.F.R. § 1502.14(a). NEPA requires federal agencies to "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources." 42 U.S.C. § 4332(2)(E); 40 C.F.R. § 1502.14(d). To satisfy this requirement, NEPA mandates that the agency give full and meaningful consideration to all reasonable alternatives. *North Idaho Cmty. Action Network v. United States DOT*, 545 F.3d 1147, 1153 (9th Cir. 2008).

In judging whether an agency considered appropriate and reasonable alternatives, a court should focus on the projects' stated purpose. *Native Ecosystems Council v. United States Forest Serv.*, 428 F.3d 1233, 1246 (9th Cir. 2005). Stated differently, the available reasonable alternatives are dictated by the underlying purpose of the proposed action. *See City of Carmel–by–the–Sea v. United States Dept. of Transp.*, 123 F.3d 1142, 1155 (9th Cir.1997). The court "reviews an agency's range of alternatives under a 'rule of reason' standard that requires an agency to set forth only those alternatives necessary to permit a reasoned choice." *Presidio Golf Club v. Nat'l Park Serv.*, 155 F.3d 1153, 1160 (9th Cir.1998). The "touchstone" for the court's review of such a NEPA challenge is whether the agency's "selection and discussion of alternatives fosters informed decision-making and informed public participation." *Westlands Water Dist. v. United States Dep't of Interior*, 376 F.3d 853, 872 (9th Cir. 2004) (citing *Block*, 690 F.2d at 767).

Plaintiffs argue the range of alternatives analyzed in this case was "extremely narrow" and inadequate because Defendants improperly defined the scope of the NEPA

analysis and the range of alternatives within the NEPA process. Plaintiffs also claim the Defendants improperly deferred, segmented, and prejudiced their consideration of key travel management options. (Dkt. 29 at 27.) In particular, Plaintiffs challenge the lack of variation among the alternatives in the miles open to motorized travel and/or road density as well as the lack of "conservation" alternatives. Defendants maintain the four action alternatives and the one no-action alternative considered in the FEIS satisfy NEPA's requirement that they consider a range of alternatives. (Dkt. 32 at 31-32.) The Defendants further point out that they considered other action alternatives and/or components, but eliminated them from detailed study because they were either outside of the scope of the project or did not comply with the Forest Plan. (Dkt. 32 at 33.) The Court has reviewed the record and find the Defendants considered an appropriate range of alternatives in this case.

The ROD provides a discussion of how the alternatives considered were developed. (AR3318-19.) It later goes on to recite the alternatives studied in detail as well as the alternatives considered but not studied in detail. (AR3351-58.) The proposed action was developed to "satisfy the requirements of the 2005 Travel Management Rule, while addressing Forestwide resource needs and concerns related to motorized and mechanized travel." (AR3354.) Other alternatives to the proposed action were developed in response to public comments received during the scoping period. The alternatives considered but not studied in detail did not meet the purpose and need for the action or otherwise did not meet the goals for the proposed action. (AR3353-54.) The FEIS is consistent with the ROD's discussion of the alternatives considered. (AR2526-27, 2561-89.)

Based on this review of the record, the Court finds the Defendants properly considered a reasonable range of alternatives as consistent with the scope and purpose of the analysis. As determined above, the forestwide scope of the project is appropriate in this case. The Defendants properly discussed their reasons for excluding certain alternatives from detailed analysis including alternatives similar to those suggested by Plaintiffs. The Court does not find the range of alternatives was too narrow given the purpose and scope of the project as well as the public comments received. Further, the fact that the alternatives did not have greater variation in the number of miles of roads open to motorized use and the density factors is reasonably explained by the Defendants. (Dkt. 32 at 32-36) (Dkt. 39 at 11-14.) For these reasons, the Defendants' Motion for Summary Judgment is granted on this claim.

## 4.     NFMA Claims

NFMA sets forth the statutory framework and specifies the procedural and substantive requirements under which the Forest Service is to manage National Forest System lands. "NFMA requires the Forest Service to develop comprehensive management plans for each unit of the National Forest System, 16 U.S.C. § 1604(a), and all subsequent agency action must be consistent with the governing forest plan § 1604(i)." *Greater Yellowstone Coalition v. Lewis*, 628 F.3d 1143, 1149 (9th Cir. 2010); *see also Earth Island Inst. v. United States Forest Serv.*, 351 F.3d 1291, 1300 (9th Cir. 2003) (citing 16 U.S.C. §§ 1604(a) and (i))).[6]

_____

[6] "In developing and maintaining each plan, the Forest Service is required to use a systematic interdisciplinary approach to achieve integrated consideration of physical,

The claims raising violations of NFMA are also brought pursuant to the APA and governed by the "arbitrary and capricious" standard. *See* 5 U.S.C. § 706. The Court may set aside agency decisions under the NFMA only if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *McNair*, 537 F.3d at 987. "[E]ven when an agency explains its decision with less than ideal clarity, a reviewing court will not upset the decision on that account if the agency's path may reasonably be discerned." *Crickon v. Thomas*, 579 F.3d 978, 982 (9th Cir. 2009) (internal quotation marks omitted). The Forest Service is required to "consider the best available science" in its analysis. 36 C.F.R. § 219.35(a) (2011).

## A.     Elk Habitat Effectiveness Calculation

The Plaintiffs' NFMA claim asserts Defendants' actions are inconsistent with the Forest Plan's establishment of certain management areas requiring 100% Elk Habitat Effectiveness ("EHE"), A-3, B-2, C-1, and C-6, and other management areas having wildlife habitat conservation as a major goal, C-3, C-4, and C-8. (Dkt. 1) (Dkt. 29 at 11-16.) Plaintiffs allege that allowing ORV use in these areas is inconsistent with the Forest Plan's mandates and fails to minimize impacts to wildlife habitat. (Dkt. 29 at 12.) Plaintiffs particularly challenge the Forest Service's failure to include motorized trails as well as roads in determining whether the proposed action meets the Forest Plan's requirement to maintain 100% EHE.

---

biological, economic, and other sciences." *Greater Yellowstone*, 628 F.3d at 1149 (citation and quotations omitted); *see also* 16 U.S.C. § 1604(b).

The 1987 Forest Plan utilized a document, *Guidelines for Evaluating and Managing Summer Elk Habitat in Northern Idaho*, published in 1985 to develop the criteria for measuring EHE. (AR42400, 42916-19, 72623, 72633.) That paper considered and discussed the impact of roads, in particular road density relating to timber harvesting activities, in calculating the impacts on elk and elk habitat. (AR72623.) The 1985 paper did not consider trails in its discussion. Relying upon the 1985 paper, the Forest Plan in turn also did not include trials in its EHE calculation. (AR42916-19.) Thereafter, in 1997, the Forest Service and Idaho Fish and Game issued the *Interagency Guidelines for Evaluating and Managing Elk Habitats and Populations in Central Idaho*. (AR72539.) The 1997 Guidelines include both roads and motorized trails in the road density calculation used to evaluate impacts on elk habitat. *See e.g.* (AR72537, 72567, 72619.)

Plaintiffs argue the 1997 Guidelines should have been used in determining the Travel Plan's compliance with the Forest Plan. Defendants maintain that the Travel Plan is in accord with the Forest Plan's EHE standards as it uses the guidelines applicable at the time the Forest Plan was implemented, the 1985 Guidelines. Defendants contend that Plaintiffs' argument mistakenly seeks to apply elk habitat analysis methodology that was developed ten years after the Forest Plan was adopted. (Dkt. 32 at 13.) In reply, Plaintiffs argue the Forest Service is required to use the best available scientific management standards applicable at the time the Travel Plan was issued, which was the 1997 Guidelines. (Dkt. 38 at 6-9.)

Having reviewed the Forest Plan, Travel Plan, both the 1985 and 1997 Guidelines, and the relevant record herein, the Court concludes that the Forest Service acted

arbitrarily and capriciously in determining that the Travel Plan was consistent with the Forest Plan.

The ROD acknowledges that the "Forest Plan recognized that motorized traffic can be a major impact on elk use of summer habitat" and that the Forest Plan provided standards for management of certain areas using the EHE model. (AR3350.) The Forest Service concluded, however, that "the standards for Elk Habitat Effectiveness in the Forest Plan were applicable only to motorized traffic on roads, not on trails." (AR3328); *see also* (AR3350.) The Forest Service's interpretation of the Forest Plan's evaluation of EHE for those Management Area Groups that are not expected to be developed is that they would not consider roads adjacent to or within those areas that existed at the time of the Forest Plan decision given those roads existed at the time the Forest Plan assumed 100% EHE in those areas. (AR3350.) Effectively, the Forest Service reasoned that the roads that existed at the time of the Forest Plan was issued, are "grandfathered" into the existing condition of those areas and their effects on EHE are to be discounted. (AR3351.) Otherwise, the Forest Service concluded, those existing roads would have made the Forest Plan's 100% EHE requirement for those areas unattainable at the time it was issued. The FEIS similarly concluded that for purposes of determining consistency with the Forest Plan that the EHE would be measured using the 1985 version of the guidelines. (AR2848-49.) The FEIS goes on to note that while trails were not included in the EHE calculation, the 1997 guidelines have been used in site-specific project analysis to compare the effects of alternatives as best available science.

The Forest Service issued a memo on May 2, 2011 providing its interpretation and reasoning for applying the guidelines for measuring EHE as those used in the Forest Plan to include roads but not motorized trails. (AR5750-51.) The memo discusses the model used in the Forest Plan as being limited to roads and states that although "the model has evolved over the years and now includes factors for trails, the test for Forest Plan standards must be made using the model as it existed at the time of the forest plan. Otherwise the standards in the Plan become a moving target. It is appropriate to utilize the current model to consider trail effects for the purpose of comparing alternatives to each other but not as a test for Forest Plan compliance." (AR5751.)

Plaintiffs maintain this memo does not satisfy 36 C.F.R. § 219.35(a) because it does not substantively consider the best science found in the 1997 guidelines nor does it discuss science in any form. (Dkt. 38 at 8 n. 10.) Plaintiffs further dispute this conclusion arguing it is "an exercise in management convenience" that fails to satisfy the requirements of NFMA. (Dkt. 38 at 8 n. 10.) Plaintiffs assert that once the Forest Service became aware of the 1997 Guidelines they were required to either 1) alter the Travel Plan or 2) amend the Forest Plan. (Dkt. 38 at 7 n. 9.) The Court agrees with the Plaintiffs.

To accept the Forest Service's conclusion would be to allow analysis and reasoning be made in a time-warp as if nothing has changed since 1987 when the guidelines for measuring the very data at issue have clearly and undisputably changed. While the Court agrees that generally data should be measured using the same yardstick, the Forest Service here takes that logic too far in order to conclude that the Travel Plan complies with the Forest Plan. Where the logic fails is in the fact that the standard is no

longer the best measurement. The Forest Service's reasoning ignores the more current guidelines used for calculating EHE and the Court finds it to be arbitrary and capricious.

When the Forest Service itself creates and adopts an updated more accurate measuring standard, that is the best science that must be considered. This is not a case where the parties are debating competing scientific analysis. *See Ecology Ctr. v. Castaneda*, 574 F.3d 652, 659 (9th Cir. 2009) ("[t]hough a party may cite studies that support a conclusion different from the one the [agency] reached, it is not [the court's] role to weigh competing scientific analyses."). Here, the Forest Service recognized and utilized the 1997 Guidelines in its discussion of the project alternatives but does not use the same standard in determining compliance with the Forest Plan's EHE requirement. (AR5750.) The Forest Service's reasoning to use the outdated calculation because that was the standard that existed at the time the Forest Plan was drafted does not properly "consider the best available science." 36 C.F.R. § 219.35(a) (2011).[7] The Court finds the Forest Service's conclusion does not use the best available science and omitting trails from its EHE calculation was arbitrary and capricious and in violation of NFMA. The Plaintiffs' Motion for Summary Judgement is granted on this claim as to this issue.

**B.     1993 Stipulation of Dismissal**

Plaintiffs argue the ROD violates the terms of a 1993 Stipulation of Dismissal which resolved a prior case involving the CNF, *The Wilderness Society et al. vs. Dale*

---

[7] The Court notes this determination is not one requiring a high level of expertise such that the Forest Service must be granted "considerable discretion." *Ecology Ctr. v. Castaneda*, 574 F.3d 652, 658 (9th Cir. 2009) (citation omitted).

*Robertson*, *et al.*, Case No. 1:93-cv-0043-HLR. (Dkt. 29) (citing AR28549.) Defendants

maintain the Travel Plan in this case is consistent with the Forest Plan and complies with

the terms of the 1993 Stipulation of Dismissal. (Dkt. 32 at 17-20.) The parties disagree

over the interpretation of the Stipulation of Dismissal as well as whether the Forest Plan

prohibits all motorized use in RWAs and Management Area B2.

Plaintiffs contend that the Forest Plan required that RWAs and Management Area

B2 be managed to protect their wilderness character which necessarily prohibits

motorized use because motorized use in such areas is inconsistent with the requirement

that the areas be managed to protect their wilderness character. (Dkt. 29 at 14) (Dkt. 38 at

9-10.) Defendants argue that the Stipulation of Dismissal concerned timber harvest, road

construction and their potential effects on water quality, old growth, and roadless

character in the area as opposed to travel management. (Dkt. 38 at 18) (citing AR5751.)[8]

Defendants disagree that motorized use in Management Area B2, RWAs, or H.R. 1570 is

prohibited and maintain instead that motorized use was actually permitted in RWAs under

---

[8] The Administrative Record contains a document from a meeting in October of
1993 sets forth the Forest Service's interpretation of the terms of the 1993 Stipulation of
Dismissal to include:
> No new roads or timber sale project decisions in lands covered by HR 1570
> as of Sept. 93.
> Manage these lands under Forest Plan stdrd. B2 for the interim.
> Will apply to any additional lands added to HR 1570 or by another
> wilderness bill proposed by Idaho delegation.
> Does not affect other types of project proposals (ie, trails)

(AR28451.) Defendants also point to a later May 2, 2011 memo to file, the Forest Service
Supervisor provides his interpretation of the Stipulation of Dismissal as being consistent
with the Forest Service's position here that the agreement applies to timber sales and
associated road building. (AR5751-52.)

the Forest Plan and, therefore, the Forest Service has discretion regarding management of motorized access in RWAs so long as wilderness characteristics in RWAs are maintained and consistent with the Forest Plan standards. (Dkt. 32 at 18-19) (Dkt. 39 at 8.)

The crux of the Forest Service's argument is that because there is no express prohibition on motorized travel in either the Travel Plan or the Stipulation of Dismissal, it has discretion to "strike the appropriate balance among competing values and uses permitted in the Forest Plan to accomplish the multiple use mandate." (Dkt. 32 at 20.) The Court agrees that neither the Forest Plan nor the Stipulation of Dismissal expressly prohibit motorized use in the RWAs of the CNF and that there has historically been some recreational motorized use in Management Area B2 and H.R. 1570 areas. (AR2635.)[9]

In the 1993 Stipulation of Dismissal, the Forest Service agreed to not approve any timber sale or road construction project decisions within H.R. 1570 and that such lands would be managed according to the Forest Plan standards and guidelines for recommended wilderness (Management Area B2) and any areas added by amendment. (AR28549-50.)[10] The Forest Plan, in turn, sets as a goal for Management Area B2 to include that the areas be managed so as to "protect [their] wilderness character."

_____

[9] The FEIS recognizes that the Forest Plan did not prohibit cross-country motorized travel except in a few specific Management Areas such as B1 and portions of A3. (AR2532.)

[10] The Forest Service agreed to revise the Forest Plan following the procedures outlined in 36 C.F.R. § 291 *et seq.* and any new regulations or Executive Orders. (AR28549.) The Forest Service also agreed to impose further conditions relating to timber sales and improved water quality in the CNF.

(AR42454.) The Forest Plan's resource standards for recreation in Management Area B2 are:

a.  Meet visual quality objective of preservation.

b.  Manage all uses to maintain wilderness qualities and retain semiprimitive settings.

(AR42454.)[11] The ROD concludes that the Travel Plan complies with the 1993 Stipulation of Dismissal because 1) no timber harvest or road construction is proposed in this project and 2) it is consistent with the Forest Plan's direction for Management Area B2 which does not preclude motorized travel. (AR3360.) As the ROD points out, the Travel Plan does not attach the typical "motorized" or "non-motorized" suffix to the semiprimitive identification for the RWAs. (AR3342.) Further, motorized travel was permitted in Management Area B2 and RWAs prior to and following the Forest Plan. Based on the record, the Court finds that neither the Forest Plan nor the terms of the Stipulation of Dismissal are violated by the Forest Service's decision to allow some limited motorized use in these areas in the Travel Plan.

The Court has also reviewed Section 4 of the Wilderness Act which limits use and activities within wilderness areas to include "no use of motor vehicles, motorized equipment or motorboats, no landing of aircraft, [and] no other form of mechanical transport...." (AR2636.) The record in this case is clear that the Forest Service considered the Wilderness Act and its intentions concerning motorized use in wilderness areas. (AR2636.) Having weighed those factors as well as the other considerations, including

---

[11] The FEIS recognizes these sections of the Forest Plan. (AR2634.)

public comments and the historical use in the area, the Forest Service has provided a reasoned explanation for its decision to exercise its discretion and allow some motorized use in these areas. Thus, the Forest Service did not act arbitrarily or capriciously in deciding to allow some managed motorized access in RWAs.

In so deciding, the Court has given due regard to "the Forest Service's discretion" and has not substituted its judgment for that of the agency. *Lands Council v. Wild West Institute*, 629 F.3d 1070, 1075 (9th Cir. 2010). "The 'Forest Service's interpretation and implementation of its own forest plan is entitled to substantial deference,'... but we must be able to 'reasonably discern from the record that the Forest Service complied' with the plan's standards." *Friends of the Wild Swan v. Weber*, 767 F.3d 936, 947 (9th Cir. 2014) (quoting *Native Ecosystems Council v. Weldon*, 697 F.3d 1043, 1056 (9th Cir. 2012) and *Native Ecosystems Council v. United States Forest Serv.*, 418 F.3d 953, 961–62 (9th Cir. 2005)). Here, the Forest Service provided a reasoned analysis of this issue in the ROD and FEIS evidencing that it considered the environmental impacts of its decision after weighing the relevant data and materials.[12] While others may disagree with the outcome of the decision, the materials in the record support the Forest Services' reasoning and conclusion. Based on the foregoing, the Court finds the Forest Service has satisfied its

---

[12] The FEIS recognizes that the documentation in the Forest Plan file "assumed these [RWA] would be managed with no motorized use" and that non-motorized, recreational use was the desired future condition for the RWAs. (AR2634-35.) In discussing the alternatives consistency with the Forest Plan, the FEIS again notes that the desired condition or goal of Management Area B2 is to "Manage each recommended wilderness to protect its wilderness character." (AR2634, 2641-45.) The FEIS also notes that the planning record states it was assumed the conditions, which did not restrict off-road vehicle use, use would "remain unchanged." (AR2634-35.)

obligations under NFMA and the Settlement Agreement. *Id.*; 16 U.S.C. § 1604(i).

Defendants' Motion for Summary Judgment is granted on this claim as to this issue.

**5.     Minimizing Criteria of Executive Orders 11644/11989 and the Travel Management Rule**

"In 1972, President Nixon issued Executive Order No. 11644 directing the land management agencies, including the Forest Service, to adopt regulations providing for administrative designation of areas and trails open and closed to motor vehicle use." *Idaho Conservation League v. Guzman*, 766 F.Supp.2d 1056, 1060-61 (D. Idaho 2011) (citing Exec. Order No. 11,644, § 3; 37 Fed. Reg. 2877 (Feb. 9, 1972)). "These regulations must 'direct that the designation of such areas and trails will be based upon [1] the protection of the resources of the public lands, [2] promotion of the safety of all users of those lands, and [3] minimization of conflicts among the various uses of those lands.' These regulations also must "require that the designation of such areas and trails shall be in accordance with" certain "minimization criteria." *Id.* The reason for the order was to "further the purpose and policy of NEPA" and established "criteria by which federal agencies were to develop regulations and administrative instructions for the designation of areas and trails on which ORVs would be permitted." *See Gardner v. United States BLM*, 633 F.Supp.2d 1212, 1217 (D.Or. 2009).[13] It also required agencies to

_____

[13] Executive Order 11644 was implemented to "establish policies and provide procedures that will ensure that the use of off-road vehicles on public lands will be controlled and directed so as to protect the resources of those lands, to promote the safety of all users of those lands, and to minimize conflicts among the various uses of those lands." *See Gardner*, 633 F.Supp.2d at 1217 (quoting Exec. Order No. 11644, 37 Fed.Reg. 2877 (Feb. 8, 1972)).

"monitor the effects" of ORV use on the public lands and "[o]n the basis of the information gathered, they shall from time to time amend or rescind designations of areas or other actions taken pursuant to this order as necessary to further the [NEPA]." *Id*. Thereafter, in 1977, President Carter issued Executive Order No. 11989, amending Executive Order 11644 and adding additional protections, "which strengthened the agencies' obligation to protect public lands from the harm caused by ORV use." *Gardner*, 633 F.Supp.2d at 1217 (citations omitted); *Guzman*, 766 F.Supp.2d at 1061 (citations omitted).[14]

In this case Plaintiffs' allege the Defendants failed to minimize 1) the impacts to the forest resources and environment and 2) user conflicts caused by motorized recreation and motorized routes as required by these provisions of law. (Dkt. 1.) Defendants counter that the Executive Orders are not actionable; i.e. that private parties may not enforce compliance with executive orders. (Dkt. 32.) Alternatively, Defendants argue they have satisfied the requirements of these provisions. (Dkt. 32, 39.)

## A.     Private Enforceability of Executive Orders

As to Defendants' argument that there is no private right of action to be had under these Executive Orders. (Dkt. 32.) This Court has previously determined that these

---

[14] "Executive Order 11989 directs the land management agencies, including the Forest Service, to close certain trails and other areas upon a finding that ORV use 'will cause or is causing considerable adverse effects on the soil, vegetation, wildlife, wildlife habitat or cultural or historic resources of particular areas or trails of the public lands.' These areas are to stay closed until the agency "determines that such adverse effects have been eliminated and that measures have been implemented to prevent future recurrence." *Guzman*, 766 F.Supp.2d at 1061; *see also Gardner*, 633 F.Supp.2d at 1217 (citing § 2 (amending Exec. Order 11644, § 9(a))).

Executive Orders are privately enforceable. *See Wilderness Society v. United States Forest Serv.*, 850 F.Supp.2d 1144, 1170 (D. Idaho 2012). For the reasons stated in that prior decision, the Court finds the Executive Orders are enforceable here. *Id.*

## B.    Defendants Compliance with the Minimizing Criteria Requirements

The standard for reviewing compliance with the Executive Orders and Travel Management Rule is the same arbitrary and capricious standard detailed above. *Carmel-By-The-Sea*, 123 F.3d at 1166. Plaintiffs allege the Travel Plan violates § 3 of Executive Order 11644 which mandates that the Forest Service regulations be in accordance with a set of criteria regarding route designations to include minimizing "damage to soil, watershed, vegetation, or other resources of the public lands," "harassment of wildlife or significant disruption of wildlife habitats," and "conflicts between off-road vehicle use and other existing or proposed recreational uses of the same or neighboring public lands, and to ensure the compatibility of such uses with existing conditions in populated areas, taking into account noise and other factors." Exec. Order 11644 § 3(a). These minimizing considerations are mirrored in the Forest Service Regulations and in the Travel Management Rule. *See* 36 C.F.R. § 212.55(b); *see also Central Sierra*, 916 F.Supp.2d at 1095.[15] The Forest Service's interpretation of these provisions is entitled to deference,

_____

[15] The regulations require that the Forest Service:

> consider effects on the following, with the objective of minimizing: (1) Damage to soil, watershed, vegetation, and other forest resources; (2) Harassment of wildlife and significant disruption of wildlife habitats; (3) Conflicts between motor vehicle use and existing or proposed recreational uses of National Forest System lands or neighboring Federal lands....

unless it is "plainly erroneous or inconsistent with the regulation." *Id.* (quoting *Auer v. Robbins*, 519 U.S. 452, 461 (1997)).

Plaintiffs argue the Travel Plan violates the Executive Orders and the Travel Management Rule because the Forest Service did not show that it had both considered the minimizing criterial and also how it had applied those criteria to routes designated in the Travel Plan. (Dkt. 29 at 16-21) (Dkt. 38 at 11-15.) Plaintiffs argue that, unlike NEPA, the Defendants must do more than consider the minimizing considerations, they must aim to minimize environmental damage when designating routes in order to comply with the Executive Orders and Travel Management Rule. (Dkt. 38 at 12.) Further, Plaintiffs point out that the Forest Service does not provide a route-by-route analysis of how it has applied the minimizing criteria when making motorized use designations and that the ROD's forest-wide non-route specific conclusory discussion is insufficient. (Dkt. 29 at 19) (Dkt. 38 at 11-12.) Defendants dispute that these provisions require the level of specificity argued by Plaintiffs. (Dkt. 39 at 10.)

At issue here is what is required by the Travel Management Rule's language obligating the Forest Service to "consider effects on [the listed criteria] with the objective of minimizing...." 36 C.F.R. § 212.55(b). Both sides generally agree that the Forest Service is required to demonstrate that it considered the minimizing criteria. Where the parties diverge is on their interpretations of what is required by the language: "with the objective of minimizing." This Court agrees with the majority of other courts who have

---

36 C.F.R. § 212.55(b).

considered this issue and concludes that in order to satisfy the Travel Management Rule, "the Forest Service must actually explain how it aimed to minimize environmental damage in designating routes...." *Central Sierra*, 916 F.Supp.2d at 1095 (citing cases). Thus, the Forest Service must show that when developing the Travel Plan it considered the minimizing criteria and also that it applied those minimizing criteria with the objective of minimizing the impacts on the natural environment. *See Id.* at 1095-96; *Guzman*, 766 F.Supp.2d at 1071-74. Stated differently, there must be "some demonstration that the minimizing criteria were then implemented into the decision process consistent with the objective of minimizing their impacts." *Guzman*, 766 F.Supp.2d at 1072.

> The Court finds instructive the following explanation provided in *Guzman*:
>
> This outcome is the same, whether the language directs that the agency "minimize" the impacts or consider the impacts "with the objective of minimizing." The language "with the objective of minimizing" means that the whole goal or purpose of the exercise is to select routes in order to minimize impacts in light of the agency's other duties. Simply listing the criteria and noting that they were considered is not sufficient to meet this standard. Instead, the Forest Service must explain how the minimization criteria were applied in the route designation decisions.

*Id.* at 1074. There is no dispute that these provisions do not require the Forest Service to entirely eliminate environmental damage caused by motor vehicle use nor is there, for that matter, any specific outcome required. *See Central Sierra*, 916 F.Supp.2d at 1095. What is required is that the Forest Service select routes "with the objective of minimizing" these effects. *Guzman*, 766 F.Supp.2d at 1074. Applying this reasoning here, the Court finds that Defendants have properly considered the minimizing criteria but have

failed to demonstrate that it selected motorized routes "with the objective of minimizing" their effects.

The ROD identifies the four minimizing criteria of the 2005 Travel Management Rule stating that, for purposes of this project, the term "minimize" is interpreted by the Forest Service as "meeting Forest Plan standards, moving forest resources toward the goals and objectives described in the Forest Plan, and complying with all state and federal regulations will minimize effects on Forest resources." (AR3314.) The ROD then concludes that "[s]ince all of the action alternatives analyzed in the EIS would meet these requirements, any of them would minimize effects on Forest resources if selected." (AR3314-15); *see also* (AR3321.) Plaintiffs contend that the Defendants cannot establish that they have properly applied the minimizing criteria by simply stating they are complying with the applicable legal mandates; arguing instead that compliance can only be shown by demonstrating they have properly applied the minimizing criteria. (Dkt. 29 at 19.) Defendants maintain they have provided the requisite explanation of how the selected routes were designed with the objective of minimizing impacts. (Dkt. 39 at 10.) The Court finds that the Forest Service is not necessarily required to conduct a route by route specific analysis as to how it has applied the minimizing criteria in every case in order to satisfy these provisions of law. That being said, more is required than to simply acknowledge the minimizing criteria and then conclude that all of the alternatives would meet those criteria. There must be some discussion, beyond conclusory statements, as to how the Forest Service's decisions were made "with the objective of minimizing" the effects of the program's uses. Defendants argue the Travel Plan complies with these

provisions and the Administrative Record is replete with evidence demonstrating and explaining how the Forest Service applied the minimizing criteria. (Dkt. 32 at 21-27.)

The Court's own review of the ROD revealed some discussion of the minimizing criteria for designation of trails and areas and recognizes the requirement that the Travel Plan be implemented with the objective of minimizing effects. (AR3363-64.) The FEIS likewise lists the purposes and needs for the Travel Plan to include managing trails and roads in the CNF so as to minimize user conflicts, prevent resource damage, and protect wildlife and wildlife habitat from undue harassment. (AR2540-42, 2546.) The FEIS then lays out the requirements of the Executive Orders and Travel Management Rule. (AR2551-2552, 2557.)

The Defendants' briefing cites broadly to the environmental consequences section of the FEIS as providing analysis of how the Travel Plan alternatives address minimizing adverse resource impacts and user conflicts. (Dkt. 32 at 25) (citing AR2656-65.) This section does not, however, satisfy the minimizing criteria requirements. It is instead a narrative of the alternatives considered with concluding sections stating that each alternative is consistent with the Forest Plan. Merely concluding that the proposed action is consistent with the Forest Plan does not, however, satisfy the requirement that the Forest Service provide some explanation or analysis showing that it considered the minimizing criteria and took some action to minimize environmental damage when designating routes.

Within the environmental consequences section of the FEIS cited by Defendants is Table 3-23 which outlines the effects of the alternative on various roadless characteristics.

(AR2663-64.) This table is a summary of the effects to certain roadless characteristics for the action alternatives but, again, it simply concludes that the alternatives comply with the Forest Plan and generally minimize cross-country disturbances and on-trail user conflicts by managing uses. Again, such a narrative does not explain how the Forest Service selected routes with the objective of minimizing these effects.

Defendants also point to lengthy sections of the FEIS which they argue provide "detailed analysis" of the Travel Plan's impact on various environmental resources. (Dkt. 32 at 26.) The first of these sections discuss the environmental consequences on watershed and fisheries conditions in the CNF using aquatic indicators. (AR2762-84.) The cumulative effects section of this portion of the FEIS points out that the "CNF has been working over the past couple of decades to identify and minimize watershed impacts from roads and trails" and describes past projects aimed at doing so. (AR2779.) This section of the FEIS makes several references to the fact that all of the action alternatives considered would eliminate unrestricted cross-country motorized travel and the selected alternative, Alternative C Modified, reduces motorized trail densities thereby decreasing the potential for wetland, riparian, streambank impacts, and associated erosion and sedimentation. (AR2778-79.) The FEIS concludes that these actions would reduce current potential for adverse cumulative effects on aquatic and watershed resources from motorized use on the CNF.

The second section cited by Defendants discusses the environmental consequences of the projects' alternatives on wildlife. (Dkt. 32 at 26) (AR2823-51.) This section identifies risks to wildlife species and habitat and discusses the effect of motor use in the

CNF. As to particular threatened/endangered or sensitive species, the FEIS states all of the alternatives are consistent with the Forest Plan and related laws. (AR2830, 2836.) The FEIS gives particular attention to Elk which has declined by approximately 87% to a critical level in certain backcountry Management Areas. (AR2840-49.) This section points out that the alternatives would not permit cross-country motorvehicle use in all of the Management Areas in the CNF and would restrict motorized use; noting in Alternative C that the motorized use restriction in Management Area C1 in particular "would likely minimize the potential contributing adverse effects of motorized disturbance and not limit the inherent physical and biological characteristics in critical calving and rearing habitats features as discussed in the Forest Plan." (AR2844.) Alternative C Modified, however, would allow for "a relatively minor increase in motorbike uses" within Management Area C1 during critical summer calving and rearing habitats and bisect the highest quality elk habitat allocated in the forest plan. (AR2845.) The FEIS recognizes that this additional motorized use would reduce wildlife habitat security and could contribute to further the decline in the elk population in Management Area C1. (AR2845.)[16]

---

[16] The FEIS goes on to note that the motorized use closures in Management Area C8S would likely benefit wildlife habitat security and reduce the contributing adverse effects associated with motorized users in "hundreds of areas of critical calving and rearing habitat." (AR2845.) The fact that closures in adjacent areas would benefit the elk habitat does provide some reasoning as to this particular route selection but that reasoning does not appear to have been made with the "objective of minimizing" as the selection of routes for motorized use bisecting the highest quality elk habitat was increased in exchange for closing other routes.

The Court has reviewed the materials in the Administrative Record, including a close review of those sections cited to by the Defendants. Having done so, the Court finds the Forest Service has demonstrated that it considered the minimizing criteria listed in the Executive Orders and the Travel Management Rule. As noted above, the ROD and FEIS both offer discussions of the impacts of the proposed alternatives on the particular criteria applicable to these provisions. However, the Court finds that the Forest Service has failed to show that the Travel Plan selected routes "with the objective of minimizing." The narrative discussions concerning the risks and impacts of the project alternatives on the listed criteria do not show how the Forest Service applied the minimizing criteria to the route designation choices. This is particularly true in regards to the elk habitat discussion where the Forest Service selected routes that were more damaging to critical elk habitat in the highest quality elk habitat in the forest.[17] The Court finds the record does not show how the Forest Service applied the minimizing criteria.

In so concluding, the Court does not find that a route-by-route discussion is necessary nor require a particular outcome. Regardless of what the Forest Service's ultimate decision is as to which routes best satisfy the project's purpose and the legal

---

[17] In contrast, the ROD discusses conditions for motorized travel to dispersed campsites that are "designed to meet the intent of the Travel Rule and to minimize the potential adverse effects on Forest resources and users...." (AR3325.) These conditions include that motorized travel to dispersed campsites along designated routes is permitted within 300 feet of a designated route during the open period, users may not "roam around with a motor vehicle off the designated route while looking for a campsite," the use of natural features to restrict vehicles from sensitive or damaged areas to protect resources, and prohibiting any motorized travel that causes resource damage. (AR3325.) Such a discussion give some indication that the Forest Service's decision as to this use was made with the objective of minimizing its impact.

requirements, the shortfall here is that the record here simply does not show that the Forest Service has acted with the objective of minimizing in this case. It may very well be that the chosen routes were in fact selected with the minimizing criteria in mind. It is just not evident from this record that is the case. The Plaintiffs' Motion for Summary Judgment is granted on this claim.

## ORDER

NOW THEREFORE IT IS HEREBY ORDERED as follows:

1) Plaintiffs' Motion for Summary Judgment (Dkt. 27) is **GRANTED IN PART AND DENIED IN PART**.

2) Defendants' Motion for Summary Judgment (Dkt. 32) is **GRANTED IN PART AND DENIED IN PART**.

3) The Travel Plan, Final Environmental Impact Statement, and Record of Decision are hereby **REMANDED** to the United States Forest Service for reconsideration and further evaluation consistent with this decision.

DATED: **March 11, 2015**

Honorable Edward J. Lodge
U. S. District Judge